**Theodore FINK, Plaintiff,**

v.

**Joan Ann MAGNER, Bernard Green, Green & Gross, P.C., Maureen Gianni, Defendants.**

**No. CIV. 3:93CV01240(WIG).**

United States District Court,
D. Connecticut.

Nov. 20, 1997.

Fink to public scrutiny of his alleged conduct.

Warren Miller, New London, CT, for plaintiff.

Alan G. Schwartz, Jeffrey Babbin, Wiggin & Dana, New Haven, CT, for Joan Ann Magner.

David P. Burke, Cecilia J. Buck, Cramer & Anderson, New Milford, CT, for Maureen Gianni.

## RULING ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

GARFINKEL, United States Magistrate Judge.

Plaintiff, Dr. Theodore Fink ("Fink"), brings this diversity action against, among

others, his former colleague Dr. Joan Magner ("Magner") alleging vexatious litigation, negligent infliction of emotional distress and intentional infliction of emotional distress.[1]

Presently pending is Magner's Motion for Summary Judgment (Doc. # 197). The issues presented in Magner's Motion for Summary Judgment are: 1) whether the doctrine of res judicata bars the present claims against Magner; and 2) whether there is a legal basis for adjudication of the claims if res judicata does not apply. For reasons hereinafter set forth, the Court concludes that both the doctrine of res judicata and the lack of legal viability of Fink's claims, independently, bar Fink's action against Magner.

## I. FACTS

An examination of the Amended Complaint and accompanying affidavits and exhibits disclose the following undisputed material facts. Fink is a licensed physician in the States of Connecticut, New York, Pennsylvania and a resident of the State of New York. Magner is a licensed physician in the State of Connecticut and a resident of Connecticut.

Fink and Dr. Robert Golenbock ("Golenbock") were 50% shareholders of the professional corporation Fink–Golenbock, M.D., P .C. ("Fink–Golenbock"), which effectively ceased operations in 1987. Prior to its demise, Magner was an employee of the corporation. Allegations made by Magner regarding Fink's lack of fitness to practice medicine contributed to the demise of Fink–Golenbock. In turn, Fink based his state court and federal claims, in part, on Magner's assertions.

On July 29, 1987, Magner filed a "petition" with the Connecticut Department of Medical Quality Assurance ("DMQA"). (Exhibit 2.)[2] The petition alleged, among other things, that Fink inappropriately counseled patients[3], gave incompetent diagnosis and/or treatment, sexually abused his adopted children and engaged in inappropriate behavior

1. Counts two, three and four against Magner were previously · dismissed by this Court on March 26, 1997 on res judicata grounds.

2. Exhibits, unless otherwise noted, are those attached in support Magner's July 11, 1994 Motion for Summary Judgment.

3. As a pediatrician all Fink's patients were children.

with patients. (*Id.*) Magner obtained this information from a variety of individuals. (*See* Exhibit 3.) Based on this information, DMQA assigned an investigator to explore the claims. After a lengthy investigation, DMQA notified Fink that it was issuing a seven-count "Statement of Charges." The charges included, but were not limited to, assertions that Fink: 1) caused a patient to disrobe and perform degrading and demeaning acts while under hypnosis; 2) ordered a patient to review pornographic magazines displaying homosexual acts and instructed said patient to discuss the photographs; 3) treated a patient with experimental therapy without permission of parents; 4) diagnosed an eight year old patient as having homosexual tendencies without a foundation; and 5) was verbally abusive to a patient. (Exhibit 6.) DMQA ultimately dismissed the charges against Fink in 1990.

After Magner filed the petition, Fink–Golenbock effectively ceased operations and several legal actions followed. In 1989, Fink brought an arbitration action against Magner alleging, among other things, breach of contract and breach of covenant not to compete. (Exhibit 8.) During the arbitration hearing Fink claimed that Magner had usurped his medical practice. (Exhibit 9; Exhibit 10.) The arbitration panel rejected these claims and decided for Magner on February 12, 1990. (Exhibit 12.)

In 1989, Fink initiated a derivative action in Connecticut Superior Court on behalf of Fink–Golenbock, claiming, among other things, that Magner had misappropriated for herself Fink–Golenbock's assets and economic opportunities. Fink further alleged that Magner (and Golenbock) prevented Fink from entering the corporation's premises (Decl. of Jeffrey Babbin in Supp. of Magner's June 26, 1996 Mot. for Sum. J., Ex. A at ¶ 13), and sought to prevent Fink from practicing medicine through acts that were offensive and unlawful (*Id.* at ¶ 33).

In March, 1995, the trial in Fink's state court derivative action concluded. The jury rendered a verdict against Magner for con-

version, tortious interference, and unjust enrichment. On July 17, 1996, the Connecticut Supreme Court reversed the judgment against Magner on the basis of res judicata. The Connecticut Supreme Court stated that Fink had previously litigated these same claims to judgment against Magner in the earlier arbitration proceeding. *See Fink v. Golenbock*, 238 Conn. 183, 198–207, 680 A.2d 1243 (1996).

In 1990, Fink began the instant federal court action, on behalf of himself, against Magner and several others who were not part of the state court action. In the instant action, Fink maintains that Magner, without probable cause, filed a complaint against Fink, with the DMQA alleging that Fink engaged in improper conduct with his clients. Thereby, Fink asserts that Magner forced him out of business (Count One, ¶¶ 10–15) and prevented Fink from entering Fink–Golenbock premises by threat of arrest (Count 2, ¶ 25).[4]

## II. *SUMMARY JUDGMENT STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." Rule 56(c); *See Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citations omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.)(1992)(internal quota-

---

**4.** Counts two, three and four of the present complaint were dismissed by this Court in its March 26, 1997 Ruling.

tion marks and citations omitted). The burden of showing that no genuine dispute about any material fact exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.)(1991) (citations omitted).

## III. DISCUSSION

### A. The Doctrine of Res Judicata Mandates Dismissal of this Action Against Magner

■ The doctrine of res judicata bars relitigation of the same claims between the same parties or their privies after a final judgment by a court of competent jurisdiction. *Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir.1992); *DeMilo and Co. v. Commissioner of Motor Vehicles*, 233 Conn. 281, 292, 659 A.2d 162 (1995). Res judicata prevents the pursuit of "any claims relating to [a] cause of action which were actually made or might have been made." *Commissioner of Environmental Protection v. Connecticut Building and Wrecking Co.*, 227 Conn. 175, 188, 629 A.2d 1116 (1988)(internal quotations omitted). The underlying policy behind res judicata is that a party should not be able to relitigate a matter which it already had an opportunity to litigate. *Clarke v. Frank*, 960 F.2d 1146, 1150 (2d Cir.1992); *Carol Man-*

*agement Corp. v. Board of Tax Review*, 228 Conn. 23, 32, 633 A.2d 1368 (1993).

■ For res judicata to apply, three elements must be present: 1) a final judgment on the merits;[5] 2) identity of parties or privity with a party from the first litigation; and 3) the claims in the second transaction must arise from the same transaction as those that were or could have been litigated in the first action. *See Wade's Dairy, Inc. v. Town of Fairfield*, 181 Conn. 556, 559–60, 436 A.2d 24; *see also, Commissioner of Environmental Protection*, 227 Conn. at 188–195, 629 A.2d 1116. A decision whether to apply the doctrine to claims which have not been litigated should be made based upon consideration of the doctrine's underlying policies to provide finality to litigation, preservation of judicial resources and repose for parties from possible harassment. *See Delahunty v. Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 674 A.2d 1290 (1996).

### 1. Privity

■ The initial issue for the Court to determine is whether there is identity of parties or privity between the parties in the state court judgment and the present case. *See Wade's Dairy, Inc. v. Town of Fairfield*, 181 Conn. at 559, 436 A.2d 24. In this case there is not an identity of parties as Fink brought the state court action derivatively, on behalf of Fink–Golenbock, and personally initiated the pending action. Therefore, the Court must ascertain whether Fink, as an individual, was in privity with Fink–Golenbock.

■ The concept of privity exists to ensure that the interests of a party against whom res judicata is being asserted was adequately represented at the prior proceeding. *Joe's Pizza, Inc. v. Aetna Life and Casualty Company*, 236 Conn. 863, 868, 675 A.2d 441 (1996). "A key consideration in determining the existence of privity is the sharing of the same legal right by the parties allegedly in privity." *Id.* (quoting *Aetna Casualty & Surety Co. v. Jones*, 220 Conn. 285, 304, 596 A.2d 414 (1991))(internal quotation

---

**5.** The final judgment for the present analysis is *Fink v. Golenbock*, 238 Conn. 183, 680 A.2d 1243 (1996). There is no dispute as to this prong of the analysis.

marks and citations omitted). While there is no bright line rule as to whether shareholders are in privity with their corporation for res judicata purposes, the Restatement (Second) of Judgments provides guidance to Connecticut courts. *See Joe's Pizza*, 236 Conn. at 868, 675 A.2d 441 (quoting *Commissioner of Environmental Protection v. Connecticut Building and Wrecking Co.*, 227 Conn. at 194, 629 A.2d 1116).

"[A] judgment in an action to which a corporation is a party has no preclusive effects on a person who is an officer, director, stockholder, or member of a non-stock corporation." Restatement (Second) Judgments (1982). However, that general rule is subject to an exception for closely held corporations:

> If the corporation is closely held, in that one or few people hold substantially the entire ownership in it, the judgment in an action ... against the corporation ... is conclusive upon ... the [holder of ownership in it] as to issues determined therein [if,] in an action ... against the corporation ... the holder of its ownership ... actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have an opportunity to relitigate the issue.

*Id.*[6] Fink was one of two shareholders of Fink–Golenbock. Both shareholders controlled fifty percent of the corporation. Thus, Fink–Golenbock was a closely held corporation.

Fink actively participated in the state court action in that he brought the action on behalf of the corporation. He had a direct financial or proprietary interest in the subject of the state action and he exercised control over the prosecution of the action. Moreover, Fink does not dispute that he maintained authority over the state court case. Additionally, Fink brought the state court action against, among others, Golenbock who was the only other shareholder of the corporation.

Although Fink argues that the interests between the state court case and the present action were inapposite, the Court is not persuaded. Both cases involved acts committed or assertions maintained against Fink which involved threats, accusations and falsities from the summer of 1987. These alleged wrongs affected Fink both individually and through the corporation. While Fink claims that the individual damages raised in the present action are personal in nature and in no way relate to the business torts of the state case, they are related through the acts and allegations which generated them. Fink actively participated in the state case and the interests were not separate and distinct from the present case. The damages engendered by the deeds and accusations from the summer of 1987 affected Fink both through the corporation of which he was one of two shareholders, and individually. Thus, using the Restatement (Second) of Judgments analysis, Fink's individual and corporate interests were not so dissimilar so that Fink should have the opportunity to relitigate them.

### 2. Transaction Test

■ The third element in determining whether a claim is barred by res judicata is whether the claims in the second transaction arise from the same transaction as those that could have been litigated in the first action. *See Wade's Dairy*, 181 Conn. at 559–60, 436 A.2d 24. Connecticut courts have adopted the "transaction test" of the Restatement (Second) of Judgments to determine "wheth-

**6.** The Court notes that several other jurisdictions employ this rule. *See, e.g., In re Beck Industries, Inc.*, 725 F.2d 880, 886 (2d Cir.1984); *Capraro v. Tilcon Gammino, Inc.*, 751 F.2d 56, 59 (1st Cir. 1985); *Aetna Casualty & Surety Co. of Hartford v. Kerr–McGee Chemical Corp.*, 875 F.2d 1252, 1258–59 (7th Cir.1989); *Alaska Foods, Inc. v. Nichiro Gyogyo Kaisha, Ltd.*, 768 P.2d 117, 122 (Alaska 1989); *Jantzen v. Baker*, 131 Wis.2d 507, 388 N.W.2d 660, 664 (1986); *Red Carpet Corp. v. Roberts*, 443 So.2d 377, 380 (Fla.App.1983); *Spickler v. Dube*, 644 A.2d 465, 468 (Me.1994);

*Missouri Mexican Products, Inc. v. Dunafon*, 873 S.W.2d 282, 286 (Mo.App.1994). In fact, certain jurisdictions have adopted an even more expansive definition of privity for closely held corporations, finding privity between a corporation and an individual based upon the individual's relationship to the corporation, without regard to the individual's involvement in the previous litigation to which the corporation was a party. *See In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983); *Hofsommer v. Hofsommer Excavating, Inc.*, 488 N.W.2d 380, 384 (N.D.1992).

er an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata." *Commissioner of Environmental Protection,* 227 Conn. at 189, 629 A.2d 1116 (internal quotation marks and citations omitted). The Restatement provides:

> The claim [that is] extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Restatement (Second) Judgments § 24.

> The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action: 1) [t]o present evidence or grounds or theories of the case not presented in the first action, or 2) [t]o seek remedies or forms of relief not demanded in the first action.

*Id.* § 25.

In applying the "transactional test," Connecticut courts "compare the complaint in the second action with the pleadings and the judgment in the first action." *Connecticut Building and Wrecking Co.,* 227 Conn. at 190, 629 A.2d 1116; *see also, Duhaime v. American Reserve Life Ins. Co.,* 200 Conn. at 365, 511 A.2d 333 (courts look to the groups of facts alleged to have caused the unlawful injury and note that even if a group of facts gives rise to several kinds of relief, it is still a single cause of action).

The present claims are inextricably intertwined with those of the state court of action. All the events in the state case and the present case arose out of a succession of facts which occurred in the summer of 1987. The allegations in each proceeding involved a series of acts committed by various defendants, including Magner, which forced Fink to depart his medical practice of pediatrics and caused him to lose his medical practice. A comparison of the present Complaint and the state court action shows comparable factual assertions. The state court Complaint alleged that Dr. Magner "made threats against [Fink] which threats were designed to and, in fact, did wrongfully prevent [the plaintiff] from practicing pediatric medicine at the Stony Hill, Bethel location." (Decl. of Jeffrey Babbin in Supp. of Magner's June 26, 1996 Mot. for Sum. J., Ex. A at ¶ 6.) The state Complaint also alleged that Magner "sought to prevent [Fink] from practicing medicine ... individually through acts and practices which were either offensive to public policy, unfair, oppressive, unscrupulous, unethical, unlawful ...." (*Id.* at ¶ 18.)

The present Complaint alleges that Magner filed a petition against Fink with the DMQA "claiming that [Fink] engaged in improper conduct with his patients." (Am. Compl., Count One, at ¶ 10.) This petition was continued without "probable cause, and with malicious intent unjustly to vex and trouble [Fink]." (*Id.* at ¶ 14.) These allegations forced Fink "out of practice while said complaint was being investigated ..." (*Id.* at ¶ 15.) These paragraphs are incorporated into every count in the Complaint.

These present allegations echo those litigated in the state court action. The "acts," and "practices" in the state Complaint are incorporated into the allegations related to Magner's petition which she filed "without probable cause." They are part and parcel of the present claims which incorporate Magner's allegations that Fink engaged in "improper conduct" with his patients. In addition, the "threats" and "acts" of the state court Complaint are the same acts that Fink presently claims forced him "out of practice."

In addition, many of the acts which "drove Fink out of practice" and the allegations which were made "without probable cause" in the present case were summarized by plaintiff's counsel in the closing argument of the state case. These included Magner filing a report with the Department of Children and Youth Services ("DCYS") regarding possible

sexual abuse by Fink of his wife's children;[7] Magner's reporting of information to DMQA (thereby threatening Fink with license revocation proceedings before the Connecticut Medical Examining Board); threats by Magner and Golenbock[8] that they would ruin him and have him arrested if he remained and continued to see patients;[9] and that all the "false complaints" were filed by Magner so Fink would leave. (Decl. of Jeffrey Babbin in Supp. of Magner's June 26, 1996 Mot. for Sum. J., Ex. B, Batesstamp 235–238.)

In comparing the present Complaint with the state action, the issues, although not identical, are so related in time, space and relation that Fink should have litigated all the causes of action together in one proceeding. The Court heeds the doctrine's underlying policies to provide finality to litigation, preservation of judicial resources and repose for parties from possible harassment. *See Delahunty,* 236 Conn. 582, 674 A.2d 1290. The present case demands finality. Fink arbitrated claims against Magner prior to the state court proceeding. Fink, through Fink–Golenbock, then unsuccessfully challenged Magner's actions in state court. *Fink,* 238 Conn. 183, 680 A.2d 1243. Now Fink attempts to challenge Magner again in the guise of a personal injury suit as opposed to injuries suffered by Fink–Golenbock. This is the third proceeding in which Fink has challenged the actions of Magner. In each proceeding Fink alleged somewhat different claims, but that does not negate the similarity of the underlying facts. The court system has allocated substantial judicial resources, at various levels, to adjudicate the underlying facts of this case. Fink has had ample opportunity to litigate the issues. Magner deserves repose from the lengthy and considerable litigation that these allegations have generated.

### 3. *A Derivative Suit and an Individual Suit Can be Brought Simultaneously*

Fink argues that he was not permitted to bring his personal claims in state court because a corporation is not able to assert these claims. *Barrett v. Southern Connecticut Gas Co.,* 172 Conn. 362, 375, 374 A.2d 1051 (1977). However, *Barrett* is not applicable to the present case. In *Barrett,* the plaintiff's individual interests were in direct opposition to the interests of the corporation. Therefore, this conflict of interest prevented the court from simultaneous adjudication of the individual and derivative action. In the present case these concerns are not present. Fink's personal interests and Fink–Golenbock's interests are nearly identical. Both interests involve damages for wrongs committed in the summer of 1987 by various defendants upon Fink.

 An individual is not prevented from bringing personal actions in conjunction with a derivative suit. *See, e.g., Levine v. Levine,* 1996 WL 745851 (Conn.Super.Ct. Dec.18, 1996); *MacAdams v. MacAdams,* 1990 WL 283863 (Conn.Super.Ct. July 25, 1990). In fact, due to the similarity of the underlying transaction, Fink was compelled to assert the present claims. Res judicata prevents the pursuit of any claims which "might have been made" in a prior action. *Connecticut Building and Wrecking Co.,* 227 Conn. at 188, 629 A.2d 1116 (1993). The doctrine extinguishes claims even when plaintiff is prepared to "present evidence or grounds or theories of the case not presented in the first action" or to "seek remedies or forms of relief not demanded in the first action." Restatement (Second) Judgments § 25. Accordingly, the Court concludes that the present action arises out of the same transaction or series of transactions as Fink's state court action and res judicata precludes adjudication of this case.

### B. *Vexatious Litigation/Emotional Distress*

Alternatively, based on the lack of the legal viability of Fink's claims, Fink's action against Magner must be dismissed.

---

**7.** Fink's wife, Gianni, is also a defendant in this action and the children were Gianni's by a previous marriage whom Fink had adopted.

**8.** Fink's former partner who is not a party to this action.

**9.** Exhibits referenced are from Declaration of Jeffrey R. Babbin in Support of Defendant Joan Magner's Renewed Motion for Summary Judgment dated June 26, 1996.

## 1. *Vexatious Litigation*

 The elements of vexatious litigation require Fink to prove that: (1) Magner initiated or procured the institution of proceedings against the plaintiff, (2) the proceedings terminated in favor of the plaintiff, (3) the defendant acted without probable cause, and (4) the defendant acted with malice. *See McHale v. W.B.S. Corp.,* 187 Conn. 444, 447, 446 A.2d 815 (1982) (citations omitted). In this case, any proof that Magner acted without probable cause is unavailing because it is not Magner's determination to make. Physicians are required to file a petition when they have "any information which appears to show that a physician is or may be unable to practice medicine with a reasonable skill or safety for any of the reasons listed in section 20–13c." [10] Conn. Gen.Stat. § 20–13d(a). The petition is to be filed with DMQA. DMQA investigates petitions "to determine if *probable cause* exists to issue a statement of charges and to institute proceedings against the physician." Conn. Gen. Stat. § 20–13e(a)(emphasis added).

Magner, as a physician, had a duty to report "any information which appear[ed] to show" that Fink was or may have been unable to practice medicine. It was not within Magner's discretion to determine whether there was probable cause or even if the allegations were founded or unfounded. In fact, a failure to report "any information" subjected Magner to suspension or revocation of her own license to practice medicine by violating Conn. Gen Stat. § 20–13d. *See* Conn. Gen.Stat. § 20–13c(7). The DMQA had responsibility for investigating the allegations and determining probable cause.

There are also notable policy reasons for disallowing a vexatious litigation suit against Magner. If a physician such as Magner was subject to a civil suit based upon lack of probable cause it would have a "chilling effect" on complaints for fear of civil suit liability. *See Field v. Kearns,* 43 Conn.App. 265,

682 A.2d 148 (1996). In *Field,* the court granted absolute immunity from vexatious litigation for complaints made about an individual's fitness to practice law. The court held that "if unsuccessful bar grievants were subject to retaliatory lawsuits it would have a 'chilling effect' on the public." *Id.* at 275, 682 A.2d 148.

Fink attempts to distinguish *Field* by claiming that a comparison cannot or should not be made between the legal profession and medical profession in terms of fitness to practice. That argument is unavailing. The public depends upon both the medical and legal professions for a high degree of competence. In fact, public confidence in a practitioner's fitness to practice medicine may be even more critical than fitness to practice law because the medical profession treats the public's direct physical health problems. In any case, this Court concludes that the logic of *Fields* is applicable to this case and that there is no legal basis for vexatious litigation.

## 2. *Emotional Distress*

 There is also no legal basis for Fink's claims of intentional infliction of emotional distress or negligent infliction of emotional distress. Relevant statements made in furtherance of a quasijudicial proceeding are absolutely privileged. *Kelley v. Bonney,* 221 Conn. 549, 566, 606 A.2d 693 (1992) (citations omitted).

The Court must first determine whether the DMQA investigation is quasi-judicial in nature. Judicial proceedings to which absolute immunity attaches have not been exactly defined. *Id.* They include any hearing before a tribunal which performs a judicial function. *Id.* It extends to proceedings of administrative officers, such as boards and commissions, which have the power to apply the law to the facts of the case which are regarded as judicial or quasi judicial in nature. *Id.* (Citations omitted).[11]

---

10. Conn. Gen.Stat. § 20–13c includes, among others, the following grounds for restriction, suspension or revocation of a physician's right to practice: "illegal, incompetent or negligent conduct in the practice of medicine."

11. *See also, Petyan v. Ellis,* 200 Conn. 243, 254–55, 510 A.2d 1337 (1986)(where the Connecticut Supreme Court held that statements in an agency filing were absolutely immune from liability for defamation and from infliction of emotional distress); *DeLaurentis,* 220 Conn. at 263–65, 597 A.2d 807 (statements contained in summons and

Although Magner's allegations were not made during a hearing, they provided the basis for the investigation which led to the DMQA's Statement of Charges. The DMQA has the power to investigate and hear facts relating to a physician's fitness to practice medicine. Based on its investigation, the DMQA then must determine whether the facts establish probable cause. By its very nature this administrative board is responsible for applying facts raised during an investigation to the legal standard of probable cause. Only after probable cause is established will a formal hearing take place. Therefore, Magner's allegations, upon which DMQA based its investigation, was a preliminary step preceding a formal hearing. This is a sufficient basis to be considered part of a quasi-judicial proceeding.

Next, the Court must determine if Magner's statements were relevant to the DMQA proceeding. Magner alleged various instances of misconduct by Fink including possible sexual abuse of children. (Ex. 3 at ¶¶ 3–8.) The DMQA proceeding was responsible for determining Fink's fitness to practice medicine. Allegations of sexual abuse of children are unquestionably relevant to this type of proceeding. Thus, Magner's statements were relevant. Based on Magner's absolute privilege, Fink's claims of emotional distress legally fail.

## CONCLUSION

For the reasons stated above, this Court hereby: GRANTS Magner's Motion for Summary Judgment (Doc. # 197).

statement of charges are absolutely privileged and cannot support action for defamation or infliction of emotional distress).